UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AHMET DEMERELLI, | ) | |
| | ) | |
| Plaintiff-Intervener | ) | |
| | ) | |
| v. | ) | No. 4:04CV00846CAS |
| | ) | |
| CONVERGYS CUSTOMER MANAGEMENT GROUP INC., | ) | |
| | ) | |
| Defendant. | ) | |

---

DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

---

THOMPSON COBURN LLP

Mary M. Bonacorsi, #2669
Laura M. Jordan, #101022
One U.S. Bank Plaza
St. Louis, Missouri 63101
314-552-6000
FAX 314-552-7000

Attorneys for Defendant, Convergys Customer
Management Group Inc.

3217917

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. UNDISPUTED FACTS ................................................................................................ 2

III. ARGUMENT ............................................................................................................... 20

   A.    Standard for Summary Judgment ................................................................ 20

   B.    Plaintiffs Cannot State a Claim Because Demirelli Is Not Qualified, With or Without Reasonable Accommodations. ...................................................... 21

       1.    Punctuality Is An Essential Function of the Position of Customer Service and Problem Resolution Representative at Convergys ........................................... 22

       2.    Plaintiffs Cannot Show that Demirelli Was Qualified Because He Was Still Chronically Tardy Even When Accommodated. .................................................. 25

       3.    Summary Judgment Is Consistent With Prior Precedent Examining Indistinguishable Facts. ................................................................................................ 30

       4.    Demirelli Was Not Qualified, With or Without Accommodations Between September 10, 2001 and April 5, 2002 Because He Failed To Maintain Authorization to Work in the United States as a Noncitizen. .............................. 32

   C.    Convergys Had a Legitimate, Non-Discriminatory Reason for Dismissing Plaintiff. ............................................................................................................ 33

   D.    Plaintiffs are Not Entitled to the Remedies Sought .................................. 35

       1.    Demirelli is Not Entitled to Backpay ........................................................ 35

       2.    Plaintiff is Not Entitled to Reinstatement or Frontpay ............................. 36

IV. CONCLUSION ........................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*Basith v. Cook County*, 241 F.3d 919 (7th Cir. 2001) ................................................ 25

*Board of Education, Island Trees v. Pico*, 457 U.S. 853 (1982) ................................ 20

*Boelman v. Manson State Bank*, 522 N.W.2d 73 (Iowa 1994) ................................. 25

*Buckles v. First Data Res., Inc.*, 176 F.3d 1098 (8th Cir. 1999) .............................. 29

*Cearley v. Gen. Am. Transp. Corp.*, 186 F.3d 887 (8th Cir. 1999) ........................... 20

*Ceasar v. United Services Auto. Ass'n*, 102 Fed. Appx. 859 (5th Cir. 2004) ..................... 30, 31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................ 20

*Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595 (8th Cir. 1998) ..................... 20, 21

*Denesha v. Farmers Ins. Exch.*, 161 F.3d 491 (8th Cir. 1998) ................................. 36

*Depaoli v. Abbott Laboratories*, 140 F.3d 668 (7th Cir. 1998) ................................ 24

*Earl v. Mervyns, Inc.*, 207 F.3d 1361 (11th Cir. 2000) ...................................... 29, 30

*EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569 (7th Cir.1997) .............................. 36

*Egbuna v. Time-Life Libraries, Inc.*, 153 F.3d 184 (4th Cir. 1998) ........................ 32

*Escobar v. Spartan Security Service*, 281 F.Supp.2d 895 (S.D. Tex. 2003) ............... 35

*Ferry v. Roosevelt Bank*, 883 F.Supp. 435 (E.D.Mo. 1995) .................................... 27

*Kiel v. Select Artificals, Inc.*, 169 F.3d 1131 (8th Cir. 1999) .................................. 27

*Hartley v. Dillard's, Inc.* 310 F.3d 1054 (8th Cir. 2002) ......................................... 36

*Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968 (8th Cir. 1994) ................................ 34

*Hatchett v. Philander Smith College*, 251 F.3d 670 (8th Cir. 2001) ....................... 32

*Hoffmann Plastic Compounds, Inc. v. National Labor Relations Board*, 535 U.S. 137 (2002) . 35, 36

*Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014 (7th Cir. 2000) ................................. 26

*Kiel v. Select Artificals, Inc.*, 169 F.3d 1131 (8th Cir. 1999) .................................. 27

*Marxkors v. GTE Wireless, Inc.*, 19 Fed.Appx. 476 (8th Cir. 2001) ......................... 34

*Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675 (8th Cir. 2001) ..................... 24, 28, 29

*Mole v. Buckhorn Rubber Products*, 165 F.3d 1212 (8th Cir. 1999) ................................. passim

*Moore v. Payless Shoe Source, Inc.*, 187 F.3d 845 (8th Cir.), *cert. denied*, 528 U.S. 1050 (1999) ......................................................................................................................... 24

*Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784 (8th Cir. 1998) ............................... 29

*Nesser v. Trans World Airlines*, 160 F.3d 442 (8th Cir. 1998) ........................... 20, 21

*Pickens v. Soo Line Railroad*, 264 F.3d 773 (8th Cir. 2001) ................................... 24

*Price v. S-B Power Tool*, 75 F.3d 362 (8th Cir. 1996) ............................................ 34

*Robinson v. Barnes Hospital*, 210 F.3d 379 (8th Cir. 2000) ................................... 34

*Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847 (8th Cir. 2002) ..................... 24

*Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984) ........................................................ 35

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) ................................. 20

*Underwood v. Perry County Comm'n*, Case No. 04-11713 (11th Cir. July 21, 2005) ............ 33

*Valdez v. Steiner Corp.*, 2004 U.S. Dist. LEXIS 14031 (N. D. Ill. 2004) ................. 26

*Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998) ......................... 27

*Webb v. Mercy Hospital*, 102 F.3d 958 (8th Cir. 1996) .......................................... 20

*Weber v. American Express Co.*, 994 F.2d 513 (8th Cir. 1993) ............................... 21

*Webster v. Henderson*, 32 Fed. Appx. 36 (4th Cir. 2002) ...................................... 26

*Wilking v. County of Ramsey*, 153 F.3d 869 (8th Cir. 1998) ................................ 20, 21, 33, 34

**Statutes**

42 U.S.C. § 12111(9) .................................................................................................. 21

42 U.S.C. § 12112(a) .................................................................................................. 19

8 U.S.C. § 1324a ................................................................................................ 36

**Rules**
Fed. R. Civ. P. 56 ............................................................................................... 2
Fed.R.Civ.P. 56(c) ............................................................................................ 20

**Regulations**
29 C.F.R. § 1630.9 ............................................................................................. 27
29 C.F.R. app. § 1630.2(m) ............................................................................. 21
29 C.F.R.§ 1630 ................................................................................................. 32

# I.  INTRODUCTION

Plaintiff Equal Employment Opportunity Commission ("EEOC") and Plaintiff-Intervener Ahmet Yigit Demirelli ("Demirelli") filed this lawsuit against Convergys Customer Management Group Inc. ("Convergys") alleging that Convergys discriminated against Demirelli because it failed to accommodate his disability.  As explained more fully herein, summary judgment should be granted in favor of Convergys because Demirelli was not qualified to perform the essential functions of the position of Customer Service and Problem Resolution Representative with or without reasonable accommodation.  They will dispute in the year prior to his dismissal, Demirelli was tardy at least 102 times, even though Convergys' attendance policy called for termination upon the accrual of 14 tardies.  Additionally, it is undisputed that even after Demirelli received all of the accommodations he needed, he still failed to meet Convergys' legitimate expectations and continued to be excessively tardy.

Further, it is undisputed that for eight months of his 18 month employment at Convergys, Demirelli, a noncitizen, failed to maintain employment authorization to work in the United States, and has not held employment authorization at any time since April 2003, precluding his ability to seek backpay since that date or frontpay at this time.

3217917

## II.  UNDISPUTED FACTS[1]

*Background Information*

1.     Demirelli was employed by Convergys from January 15, 2001 until June 27, 2002 as Customer Service and Problem Resolution Representative.[2]  (Deposition of Plaintiff Ahmet Yigit Demirelli, attached hereto as Ex. A and hereinafter referred to as "Demirelli Depo." 44:4-6, 173:20-174:2,  Ex. 39 attached thereto).

2.     Demirelli is a 24 year old with osteogenesis imperfecta, a condition commonly referred to as "brittle bone disease."  (Demirelli Depo. 8:23-24, 16:11-16).  Demirelli is confined to a wheelchair but has not taken any medication to treat his condition since 1999.  (Complaint ¶ 8, Demirelli Depo. 18:2-16, 16:25-17:6).  His physical condition has not changed since at least 1999.  (Demirelli Depo. 23:25-24:13).[3]

3.     The Convergys facility in Hazelwood, Missouri serves as a in-bound call center handling calls from customers of Convergys' clients. (Deposition of Laura Ashton, former Senior Human Resources Manager for Convergys, attached hereto as Ex. B and hereinafter referred to as "Ashton Depo." 82:13-90:19).  For example, if a company set up a "1-800" number for customers to participate in a promotion or for customer service assistance, Convergys is contracted by that company to accept those in-bound calls.

---

[1] Consistent with Fed. R. Civ. P. 56, the following statement of facts assumes the truth of all of Plaintiffs' allegations that are supported by competent evidence.  The facts contained herein are assumed to be correct by Convergys *solely* for the purposes of this motion.

[2] The position of Customer Service and Problem Resolution Representative at Convergys is also referred to at times as "Agent" or "Associate."

[3] For purposes of this motion only, Convergys assumes that Demirelli was disabled.

4.      Convergys was the first and only company that ever hired Demirelli.  (Demirelli Depo. 12:19-13:2, 29:22-30:1).

5.      At all times during Demirelli's employment, Convergys had in place a policy to provide reasonable accommodations for disabled employees.  Specifically, Convergys' policy reads:

> Federal regulation and Convergys policy require that reasonable accommodations be made for physical and mental disabilities of qualified employees and applicants in all aspects of employment when a need is identified.  Hires, transfers, upgrades or promotions may not be denied to individuals with disabilities because of the need to make reasonable accommodations.
> The extent of Convergys' accommodation obligations and the reasonableness of any particular accommodation are determined on a case-by-case basis, considering various factors, including cost, the organization's size, and the effect on how work is performed.  Convergys requests advice and assistance from both internal and external sources when exploring the feasibility of structural and nonstructural accommodations.

(Demirelli depo. 59:2-12, 143:1-144:8, Exs. 25 and 37 attached thereto).  Demirelli acknowledged receiving this policy. *Id.*

6.      In addition, Convergys' Code of Business Conduct, which was provided to Demirelli at the time he was hired, reads:

> Convergys is committed to providing a work environment that is free from unlawful discrimination.  …Specifically, Convergys is committed to a work environment that is free from discrimination on the basis of race, religion, color, creed, national origin, age, sex, disability, veteran status, or other unlawful factors.  If you have complaints of discrimination… report it to your supervisor or Human Resources representative.  Complaints of offensive or improper conduct are taken seriously and investigated thoroughly.

(Demirelli Depo. 28:16-32:10, Exs. 21, 22 attached thereto).

7.      Convergys is located in the Village Square Shopping Center in Hazelwood, Missouri. (Demirelli Depo. 33:11-22).  Convergys shares its leased space in the shopping center with

several other tenants including Sanford Brown College, a former movie theater, a government office, the Hanish Eye Institute and the SSM Rehabilitation Center. (Demirelli Depo. Ex. 23, 34:10-25:15).

8.    The parking lot at the Village Square Shopping Center contains at least 12 handicapped parking spaces immediately in front of Convergys' facility. (Demirelli Depo. 36:20-24). The parking lot at the Village Square Shopping Center is a public parking lot that is neither owned nor controlled by Convergys. (Deposition of Teresa Horstmann, former Senior Human Resources Manager for Convergys, attached hereto as Ex. C and hereinafter referred to as "Horstmann Depo." 93:11-94:11).

9.    Convergys hired Demirelli to provide technical support to DSL customers of a client of Convergys at that time. (Demirelli Depo. 30:19-31:6; Deposition of LaShonDa Aldridge, former Team Leader and current Operations Manager for Convergys, attached hereto as Ex. D and hereinafter referred to as "Aldridge Depo." 328:19-21). Demirelli worked on the evening shift of during his entire employment with Convergys. (Demirelli Depo. 64:11-13, 75:16-19).

10.    At the time Demirelli was employed on the client project, the project operated from 6:00 a.m. to 1:00 a.m. (Deposition of Stephen Brookins, Operations Manager for Convergys, attached hereto as Ex. E and hereinafter referred to as "Brookins Depo." 35:18-36:1).

11.    Generally Agents employed by Convergys, such as Demirelli, do not work on a fixed shift. Instead, they work on a flexible schedule with start times beginning in 15 minute increments, which varied depending on projected call volume. (Ashton Depo. 78:17-80:9, Brookins Depo. 37:1-38:4, 39:3-40:14).

12.    Demirelli received a 30 minute meal break.  (Demirelli Depo. 74:1-3; Brookins Depo. 52:17-18).  He was aware of the time made available to him for a meal break and he knew there was no grace period provided to return to work after a meal break.  (Demirelli Depo. 74:1-20).

13.    Demirelli remained on Convergys' premises for meal breaks.  Convergys provided two cafeterias with vending services for employees to use for meal breaks.  (Demirelli Depo. 75:20-76:14).

***The Convergys Attendance Policy***

14.    At all times during Demirelli's employment with Convergys, Convergys had in place a no-fault attendance policy, which Demirelli acknowledged in writing that he received.  Convergys' attendance policy reads:

> We are working hard to make your employment with Convergys both challenging and rewarding.  In return, we have high expectations of you as an Associate – *to show up for work on-time every day so that you can provide the best possible customer service to our clients.*
> Tardiness is defined as working less than 100%, but greater than 75%, of the scheduled shift.  An Associate is considered tardy when he or she:
> -Leaves work prior to the end of the scheduled shift (3 minutes or more)
> -Arrives to work after the start of the scheduled shift (3 minutes or more)
> -Returns late from meal or break (3 minutes or more).
>
> Multiple tardies can be incurred in a single day, even if the Associate works in excess of 75% of the scheduled shift.
>
> Like the absence policy, the tardiness policy is based on a rolling 365-day calendar.  If you are tardy:
> Ten (10) times – Will result in a documented verbal reminder with specific behavioral expectations.
> Twelve (12) times – Will result in a written reminder with specific behavioral expectations.
> Fourteen (14) times or failure to meet behavioral expectations – You may be terminated.
> Patterned tardiness will also result in disciplinary action.

(Demirelli Depo. 110:9-22, 143:1-144:8, Exs. 25, 37 attached thereto)(emphasis in original).

5

15.    Convergys' attendance policy also provided that 8 absences would result in a written warning and an employee could be terminated upon the accrual of 10 absences.  *Id.*

16.    In addition, if an employee was absent from work and did not call into Convergys' attendance telephone line (known as a No Call/No Show) the employee would receive a written warning.  "Two such instances within a rolling 365-day period will be considered job abandonment and will result in termination."  (*Id.*; Deposition of Marlon Mitchell, former Team Leader for Convergys, attached hereto as Ex. F and hereinafter referred to as "Mitchell Depo." 152:15-153:4).  Convergys strictly enforced its no-call/no-show policy.  (Mitchell Depo. 154:2-12).

17.    The Convergys facility in Hazelwood, Missouri serves as an in-bound call center handling calls from customers of Convergys clients.  Because Convergys is hired to take calls directed to its clients, it is necessary that Convergys sufficiently staff its projects to meet projected call volume.  (Ashton Depo. 82:13-90:19).

18.    Employees are scheduled to work based on the company's business needs and projected call volume.  (Aldridge Depo. 36:3-15).  To determine the necessary level of staffing, Convergys' clients provide the company data forecasting call volume.  Convergys is, in turn, expected to appropriately staff the project to handle the forecasted call volume.  (Aldridge Depo. 36:3-37:25).

19.    If agents do not report to work at the time they are scheduled, the company may fail to meet contractual performance measures, which in some cases results in the loss of revenue to the company.  (Brookins Depo. 88:9-91:3; Ashton Depo.85:21-86:11).  Specifically, in contracting with its clients, Convergys is bound by direct measures of quality (known as "DMOQs") which define client expectations.  DMOQs include the rate at which customers abandon calls due to

excessive wait times, and other factors that determine the level of service provided. (Ashton Depo. 82:13-83:24).

20.    In order to meet the DMOQs defined by Convergys' clients, Convergys tracks the performance of every project in half-hour increments. That information is available to its clients in real-time. (Ashton Depo. 82:18-84:17).

21.    Failure to meet contractual DMOQs defined by Convergys' clients could result in a revenue loss. As Laura Ashton testified, "If we miss our DMOQ measures three half-hours, we've lost the whole day. And depending upon – losing the day, for example, could result in us having to give the client back money. I mean, it's a financial – it's a big, huge deal." (Ashton Depo. 82:18-83:24).

22.    Employee schedule adherence is critical to ensuring that the company meets its contracted DMOQs. An employee not present as scheduled can result in the company's failure to take projected calls. (Ashton Depo. 85:21-86:11, 87:7-14; Aldridge Depo. 43:12-25).

23.    LaShonDa Aldridge, Demirelli's former supervisor, testified that "They way the nature of our business works is that we have to have bodies in seats at particular times of the day to service customers. We have contractually agreed with [the client to which Demirelli was assigned] that would answer a certain percentage of their calls within a minute, within 60 seconds, or at that particular time we are in jeopardy of whatever the contractual agreement is." (Aldridge Depo. 194:6-195:7).

24.    In order to ensure that agents are available to take calls as scheduled, direct supervisors of the Agents, known as Team Leaders, track Agent attendance daily. (Brookins Depo. 57:1-14, 58:7-20; Mitchell Depo. 110:16-19). In addition, as the Operations Manager of the client project

to which Demirelli was assigned, Stephen Brookins conducted audits of agent attendance and reviewed attendance reports daily.  (Brookins Depo. 16:10-17:25, 57:1-14).

25.    Demirelli understood that it was important to be punctual reporting to work at Convergys and he was aware of the terms of the progressive discipline for employees who violated the policy.  (Demirelli Depo. 61:12-62:4, 62:15-63:8, 94:23-95:22, 108:17-19).

26.    Demirelli knew exactly what time he was scheduled to start work, when he actually logged into work, and each time that he was tardy.  (Demirelli Depo. 108:2-16, 110:23-111:12).

27.    Demirelli admits that it was his responsibility to get to work on time.  (Demirelli Depo. 46:18-47:1).

28.    Demirelli had the resources available to him to keep track of his tardies, and, in fact, knew he was tardy every time before he even logged in to the company's systems.  (Demirelli Depo. 111:19-22).

### Demirelli's Attendance

29.    For the entire first six months of Demirelli's employment, he arrived at work on time and got back and forth between breaks and meal periods timely and without any assistance or accommodations.  (Demirelli Depo. 80:15-22, 81:19-82:26, 89:3-10).  In fact, Demirelli did not accrue any tardies from January 2001 until the end of June 2001, followed by 4 tardies and 1 absence in July 2001.  *Id.*

30.    In August 2001, seven months after he began working at Convergys, Demirelli received a review from Loretta Hill, his Team Leader at the time, which noted that Demirelli had accrued 4 tardies during the month of July 2001.  Ms. Hill wrote that "Yigit understands policies and procedures and attendance."  Demirelli signed the review, acknowledging that the review was

8

presented and discussed with him, and he provided no written comments to the review. (Demirelli Depo. 82:23-84:13, Ex. 27 attached thereto).

31.    On November 1, 2001, 10 months after he started working at Convergys, Demirelli received a verbal warning for excessive tardiness.  Specifically, Demirelli had accrued 10 tardies between June 2001 and October 2001.  (Demirelli Depo. 96:5-24, Ex. 29 attached thereto).

32.    At the time Demirelli received this warning, he understood that if he was tardy just 4 more times, he was subject to termination.  (Demirelli Depo. 11:16-18).

33.    For a month after receiving his verbal warning for tardiness in November 2001, Demirelli had perfect attendance and no tardies, which he accomplished by trying "to go a little faster than usual."  (Demirelli Depo. 103:16-104:8).

34.    Then, in or around December 2001 or January 2002 Demirelli's supervisor at the time, Rick Lartch, went on medical leave, and Demirelli was without a direct supervisor.  (Demirelli Depo. 104:23-105:17).

35.    There were no changes in Demirelli's personal circumstances or physical condition during 2002 that made him more or less physically able to report to work on time as scheduled. (Demirelli Depo. 106:16-23).

36.    The only difference in Demirelli's circumstances in 2002 was that he was not under any direct supervision to be reviewed and monitored by a Convergys supervisor.  (Demirelli Depo. 106:24-107:1).  Specifically, for approximately two months – from January 2002 to March 2002 Demirelli was part of a team that was without a team leader.  (Demirelli Depo. 104:23-105:27, 115:24-116:5, 124:4-125:6; Brookins Depo. 171:24-172:10).[4]

---

[4] Even though Demirelli was without a direct supervisor present to monitor his attendance, there were approximately eight other team leaders present on the floor available to assist Demirelli, or any other employee with issues. (Brookins Depo. 33:15-23; Aldridge Depo. 44:44:9-24).

37.    In or near March 2002 Marlon Mitchell took over as Demirelli's direct supervisor. (Demirelli Depo. 115:24-116:5).

38.    Demirelli knew that he was frequently tardy while his supervisory was away.   He also knew that  when no one was monitoring his attendance he exceeded the number of tardies permissible under the policy and was subject to termination.  (Demirelli Depo. 114:7-9, 115:8-15).

39.    On March 20, 2002, Demirelli received a written warning from Marlon Mitchell for incurring one no-call/no show on March 15, 2002.  (Demirelli Depo. 115:24-116:5, 124:4-125:6, Ex. 33 attached thereto).

40.    On April 18, 2002 Demirelli received a written warning from Marlon Mitchell for accruing 18 tardies in a 12 month period.  Demirelli knew at the time that he received the written warning that he had already exceeded the number of accrued tardies permitted under Convergys' attendance policy and that he was subject to termination for every tardy over 14.  (Demirelli Depo. 126:10-24, Ex. 32 attached thereto).

41.    At the time he received the written warning in April 2002, Demirelli knew that his attendance problem was serious and that he could be terminated.  (Demirelli Depo. 127:25-128:5).

42.    Also, on April 18, 2002, Demirelli received a written warning for accruing 8 absences. Demirelli's written warning advised Demirelli that "Failure to observe the Attendance Policy of Convergy or any other policy or procedure may result in further disciplinary action up to and including termination."  (Demirelli Depo. 124:13-15, 127:13-16, Ex. 31 attached thereto).

43.    By April 2002, Demirelli actually had 3 different written warnings relating directly to his nonadherence to the attendance policy with respect to absences, tardies and no-call/no-shows.

This combination of written discipline also could have resulted in dismissal.  (Mitchell Depo. 158:14-160:2).

44.    On or around April 18, 2002 Marlon Mitchell resigned his employment with Convergys and LaShonDa Aldridge took over as Demirelli's Team Leader.  (Aldridge Depo. 154:3-16).

45.    Prior to Mitchell's last day of work, he prepared a note to Demirelli's file.  Mr. Mitchell wrote:

> On April 18th at 6:05 pm. I discussed with Yigit the reasons for his tardiness.  Agent explained that he switched from the 3:00 pm – 11 pm shift to the 4:30 pm – 1:00 am shift, to find available parking.  I then asked Yigit to explain why he continued to be tardy after switching shift to his new hours, Yigit explained that he is having difficulty finding a seat on the floor when he arrives at 4:30 pm. I then suggested to Yigit that he needs to arrive early for his shift to avoid any further tardy occurrences.  I then explained to Yigit that it is necessary that he be placed on a written warning for his 19 tardy occurrences and that one more occurrence may result in termination.  I then supplied Yigit a copy of the "Associates manual" attendance policy for him to review.

(Mitchell Depo. 78:23-79:15; Demirelli Depo. 130:10-15, Ex. 34).

46.    Also prior to his dismissal and contemporaneous with this memo, Marlon Mitchell met with LaShonDa Aldridge the Team Leader assigned to take over supervision of Demirelli, and advised Ms. Aldridge that Demirelli was on a written warning for tardiness.  Marlon Mitchell also told LaShonDa Aldridge that Demirelli's schedule had been changed to a fixed start time of 4:30 p.m. to allow him to get to work on time.  (Aldridge Depo. 191:6-192:3).

47.    Demirelli's attendance records also reflect that on May 19, 2002, Demirelli incurred a second no-call/no show, which should have resulted in his termination under Convergys' attendance policy.  (Deposition of Tara Match, Senior Business Systems Analyst for Convergys, attached hereto as Ex. G and hereinafter referred to as "Match Depo." 71:20-73:2, Ex. 4  attached thereto; Demirelli Depo. Ex. 25; Mitchell Depo. 152:24-153:4)

48.    Demirelli's direct supervisors did not record each of his attendance violations incurred by Demirelli in his attendance record.  Demirelli's attendance records reflect that he was tardy 102 times in the year prior to his dismissal.  And, Demirelli acknowledged that the attendance records accurately reflect his attendance during that period.  (Demirelli Depo. 135:16-136:5, Ex. 36 attached thereto).

49.    Of those tardies, he was late arriving to work 37 times, and late returning from his meal break 65 times.  Demirelli's attendance records also reflect that he was tardy 19 Sundays in a twelve month period.  *Id.*  On Sundays, many of the businesses that shared a parking lot with Convergys were not open, and Convergys itself operated a skeleton crew.  (Mitchell Depo. 161:25-162:19).

50.    LaShonDa Aldridge was aware of the 17 tardies Demirelli incurred after April 18, 2002 but did not enter the attendance violations into Demirelli's attendance record.  Aldridge knew that Demirelli was on a final written warning and subject to termination if he incurred any additional tardies.  Aldridge testified: "I was trying to work with Mr. Demirelli in keeping his employment, and he told me that he would do better and I believed him."  (Aldridge Depo. 225:1-10, 230:23-233:4, 247:1-23).

### Demirelli's Immigration Status and Employment Authorization

51.    Demirelli is a citizen of Turkey, and currently is in the United States in deferred action. (Deposition of Chester Moyer, United States Citizenship and Immigration Services, attached hereto as Ex. H and hereinafter referred to as "Moyer Depo." 20:3-20:8).[5]

---

[5] The USCIS provided Demirelli with deferred action (described as "administrative grace" by the USCIS)  based upon his medical condition.  (Demirelli Depo. 161:22-162:7).  Although deferred action is generally only granted for a year or less, Demirelli has been present in the United States in deferred for at least 7 years.  (Moyer Depo. 20:3-20:8, 16:25-17:17, 26:1-27:15; Demirelli Depo. 162: 8-10).

52.    Because he is present in the United States in deferred action, Demirelli is required to apply to the United States Citizenship and Immigration Services ("USCIS", formerly known as the INS) for authorization to engage in employment in the United States.  (Demirelli Depo. 161:22-163:2; Moyer Depo. 16:13-24).

53.    Although Demirelli possessed employment authorization at the time he was hired in January 2001, his employment authorization expired on September 9, 2001.  (Moyer Depo. 41:3-23, 43:25-44:10).

54.    Demirelli was not legally authorized to work in the United States between September 10, 2001 and April 5, 2002.  (Moyer Depo. 41:3-23, 43:25-44:10).

55.    Demirelli's most recent employment authorization expired in April 2003.  He has not applied for employment authorization nor held employment authorization since April 23, 2003. (Moyer Depo. 41:19-42:8).

***Demirelli's Dismissal***

56.    Demirelli was dismissed on or about June 27, 2002. (Demirelli Depo. 173:20-174:2 Ex. 39).

57.    Demirelli admits that he was terminated because of his tardiness and for no other reason.  (Demirelli Depo. 160:21).

58.    Upon his dismissal, Demirelli completed an Exit Interview form and wrote the following:

> I fully realize that I have been less than perfect with my time management here at Convergys.  However I must point out certain factors that contributed to my tardiness.  First off hand, as I have stated to my superiors before, most of my tardies were caused due to lack of accessible/handicapped parking spaces.  I have even changed my scheduled from 3 pm -11 pm to 4:30 pm – 1:00 am so that I might find vacant spots as the 4 pm shift leaves.  Correspondingly, after my first manager (Loretta Hill) left Convergys I was left unsupervised, without a

13

manager for a period of two months. Thus, there was no one to give me a
verbal warning so that I would have a chance to stop my tardies.
Thus, because of the reasons I have listed above I feel I have been
wrongly terminated. I would also like to state that I fully contributed all
of my talents/skills to the clients of this company in order to resolve their
problems.
While I disagree with the decision of the HR [department] I want to
express I have enjoyed fully working here and interacting with my
colleagues.
I kindly request that you reconsider your decision.

(Demirelli Depo. 190:12-191:12, Ex. 40 attached thereto).

### *Demirelli's Accommodation Requests*

59.    Demirelli identified only three accommodations he ever requested or believed he

needed while he was employed at Converygs. Specifically, Demirelli testified:

The accommodation I was seeking was a parking space, a headset and a
place to sit, which is what I have always told every supervisor. I was not
seeking for special treatment or any other type of accommodation. I
simply need – required the accommodation of parking, a place to sit and a
pair of headphones to be able to do my job on time.

(Demirelli Depo. 194:16-23).

### **Reserved Parking Spaces**

60.    Demirelli requested a reserved handicap parking space because he was having difficulty

finding available parking at the time of his scheduled start time. (Demirelli Depo. 90:5-13).

61.    Demirelli's request for reserved handicap parking was forwarded to Stephen Brookins,

the Operations Manager on the project where Demirelli worked. Stephen Brookins contacted

Yovandra Clark Dailey, then Associate Manager of Employee Relations at Convergys, advising

her of Demirelli's request. (Deposition of Yovandra Clark Dailey, attached hereto as Ex. I and

hereinafter referred to as "Dailey Depo." 104:19-25).

62.   Ms. Dailey contacted her supervisor in Human Resources, Teresa Horstmann, to consider Demirelli's request.  Ms. Dailey told Ms. Horstmann that Mr. Demirelli was requesting a handicapped parking space to help alleviate his tardiness.  (Dailey Depo. 105:10-14).

63.   Ms. Horstmann did not feel that providing Demirelli an assigned parking spot in the public parking lot was appropriate because he only worked in the afternoons, and allocating a handicapped parking spot in the public lot solely for his use would deprive other disabled employees of Convergys or other tenants of the shopping center from the use of the spot when Demirelli was not present.  (Horstmann Depo. 93:11-94:11, 97:14-98:4).

64.   Ms. Horstmann considered the options and decided that Demirelli's parking issues could be resolved by moving his scheduled start time to 4:30 p.m.  Specifically, Ms. Horstmann testified "The parking lot in the evening is much less crowded than it is during the daytime.  So we made that adjustment in the schedule to alleviate the crowded parking lot.  He was already available evenings.  It just made sense to shift those hours a little bit later so that parking was available."  (Horstmann Depo. 97:14-98:4).

65.   In light of these issues, Demirelli did not receive a reserved parking space.  Instead, Convergys moved Demirelli's start time from a roaming start time to a fixed start time of 4:30 p.m., when the shared parking lot was not as congested.  (Demirelli Depo. 152:12-17).  Demirelli's managers believed that he would have an easier time finding available handicap parking with a 4:30 start time rather than earlier in the afternoon when he was previously scheduled to work.  (Brookins Depo. 66:17-67:6).

66.   By April 18, 2002 Demirelli's shift was changed to a fixed start time of 4:30 p.m.  (Demirelli Depo. 48:6-49:5, 129:3-25).  Once he started on this fixed start time, Demirelli was

scheduled to work from 4:30 p.m. to 1:00 a.m., when the client project shut down.  (Demirelli Depo. 130:10-15, Ex. 34; Aldridge Depo. 33:22-34:1).

67.    It was not normal procedure to provide an agent with a fixed start time.  (Aldridge Depo. 193:12-195:16).

68.    After Demirelli's start time was changed to a fixed 4:30 start time, Demirelli was able to find available parking and arrive to work on time.  (Demirelli Depo. 136:10-137:7, 137:11-14, 140:23-141:7).

### Assigned Seating

69.    During the period of time that Demirelli reported to Loretta Hill, he received an assigned seat near Ms. Hill, and near the door.  (Demirelli 101:14-101:24; Hill Depo. 131:9-133:4)  This assigned seat had his name on it, and was available for him to sit in every day.  If someone was sitting in the seat, Demirelli requested the assistance of his team leader, who made the seat available to Demirelli.  (Demirelli Depo. 120:12-14, 196:23-198:23, Ex. 23 (first seat location marked "Sit Place (Loretta Hill)"); Hill Depo. 58:12-22).

70.    As of April 18, 2002, until the end of his employment, Demirelli was again sitting in a seat that was available to him every day located approximately 5-10 feet to the entrance of the work area.  (Demirelli Depo. 68:5-8, 69:5-21, 113:2-5, 137:15-138:14).

71.    Demirelli had no difficulty getting to the restroom at this seat.  (Demirelli Depo. 73:9-12).  Demirelli identified this seat as the most accessible place to sit and where he had the least difficulty getting to the door.  (Demirelli Depo. 70:8-10).

### Headsets

72.    Agents at Convergys are required to use a headset in order to log into the phone system. (Demirelli Depo. 87:22-88:1).  However, it was not necessary to have a headset to log into the

company's timekeeping system which showed that the employee was present at work as scheduled. (Mitchell Depo. 31:13-21). Employees actually could log into work in the timekeeping system at any computer station anywhere on the production floor, including at a supervisor's desk. (Mitchell Depo. 31:13-21; Aldridge Depo. 116:13-18).

73. Because the headsets were detachable, from time to time a headset would not be in the employee's cubicle. (Demirelli Depo. 70:11-20; Mitchell Depo. 28:13-16). However, Convergys had a rule in place that headsets could not be removed from the workstations. (Aldridge Depo. 113:3-14).

74. There were times when Demirelli asked his supervisor for assistance in finding a headset. Because team leaders kept extra headsets locked in a nearby cabinet, it took supervisors "less than a minute" to get headsets for agents who did not have a headset in his workstation at the start of their shift. (Deposition of Loretta Hill, former Team Leader of Convergys, attached hereto as Exhibit J and hereinafter referred to as "Hill Depo." 60:7-21, 163:13-20).

75. By April 15, 2002 Demirelli had a personal headset. (Demirelli Depo. 137:15-138:14).

**_Demirelli's Attendance With Accommodations_**

76. After April 18, 2002, Demirelli had received accommodations to allow him to be at work on time. Although Demirelli knew he was on a final written warning for three different types of attendance violations, he was still tardy 17 times returning to work from his meal break. However, after April 18 he arrived to work at the start of his shift on time as scheduled. (Demirelli Depo. 138:15-139:2). Specifically, Demirelli tesitifed:

> Q: Okay. Good. So the only tardies that you had after April 15th were coming back from meal--
> A: Yes.
> Q: -- from your evening meal; right?
> A: Yes.

Q:  And as I understand it, the reason that you were able to be on time after April 15th arriving at work was because you changed your shift?

A:  Yes.

Q:  And because you had found this last seat in the [client project] quad that's depicted on Exhibit 23?

A:  Yes.

Q:  Okay.  Now you were also able to log in on time; right?

…

THE WITNESS:  Obvious, because of the fact that I had a place to sit, I have a lot more time to hunt for headsets.

Q:  (By Ms. Bonacorsi)  So you had a place to sit – and so you had a headset every day at 4:30 that you went to work after April 15th; right?

A:  Yes.  According to this list, yes.

Q:  And so you were able to start with your headset, taking phone calls, every day after you got your written warning – three written warnings from Marlon Mitchell on April 18th; right?

A:  Yes.

Q:  And you knew that if you were going to be tardy one more time after you got those three written warnings that you could be terminated; right?

A:  Yes.

Q:  And, Yigit, count the number of times you were tardy coming back from meal after April 15th.

A:  I know exactly why that is.

Q:  I asked you to count and tell me how many times you were tardy after April 15th, coming back from lunch.

A:  Seventeen times.

Q:  Okay.  And every time you logged in late after meal you knew you were late, didn't you?

A:  Yes.

(Demirelli Depo. 137:6-138:25).

77.  Demirelli never requested a longer meal period.  (Demirelli Depo. 196:5-10).

78.  LaShonDa Aldirdge never considered giving Demirelli a longer lunch break because he never requested it.  (Aldridge Depo. 335:18-336:16).

79.  Demirelli believes that he should have been able to come and go from his meal break in whatever time he required to have a meal and return to his desk, but he "[could not] honestly say" how much additional time he needed beyond the 30 minute meal break provided by the company.  (Demirelli Depo. 159:18-15).  Specifically, Demirelli testified:

> Q: So, essentially, you were asking that the 30-minute lunch policy with the three-minute grace period not apply to you, that you get more time than everybody else; is that fair to say?
> A: I was requesting that accommodation would be made on account of my physical condition.
> Q: Okay. And you were requesting that they ignore your tardies or that you get more time every single time you went to lunch?
> A: … I was simply requesting, if I do have so many tardies, that if they could maybe be forgiven because of my situation.

(Demirelli Depo. 157:4-24).

80.    Plaintiff EEOC also believes that Demirelli should have been able to work later to make up missed time. (Plaintiff EEOC's Answers and Objections to Defendant's First Set of Interrogatories Directed to Plaintiff EEOC, No. 2, attached hereto as Ex. K).

***The Complaint***

81.    Plaintiff Equal Employment Opportunity ("EEOC") filed a one count complaint against Convergys under Section 102(a) of Title I of the ADA, 42 U.S.C. § 12112(a). The EEOC alleges that Convergys "failed and refused to provide reasonable accommodation for Demerelli's disability and terminated him because of his disability, brittle bone disease." (Complaint ¶ 8).

82.    On December 10, 2004, by leave of the court, Demirelli intervened as a Plaintiff. Demirelli filed a one count complaint raising the same allegations as those raised in the EEOC's Complaint. (Plaintiff-Intervener Complaint ¶¶ 8-9).[6]

83.    Plaintiff EEOC and Plaintiff-Intervener seek, among other things, backpay and reinstatement for Demirelli. (Complaint, Prayer for Relief; Plaintiff-Intervener Complaint, "Wherefore" Paragraph).

---

[6] Plaintiff EEOC and Plaintiff Demirelli are sometimes referred to herein collectively as "Plaintiffs."

# III.  ARGUMENT

### A.     *Standard for Summary Judgment*

The Court "must grant summary judgment if, based upon the pleadings, admissions, depositions and affidavits, there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Davidson & Assoc. Inc. v. Internet Gateway, Inc.,* 334 F.Supp.2d 1167, 1167-68 (E.D. Mo. 2004) (citing Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Board of Education, Island Trees v. Pico,* 457 U.S. 853, 863 (1982)). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Cearley v. Gen. Am. Transp. Corp.,* 186 F.3d 887, 889 (8th Cir. 1999).

To establish a prima facie case of disability discrimination under the ADA, "[Plaintiff] must show that at the time in question [he] was disabled, was qualified to perform the essential functions of [his] job with or without reasonable accommodations and was terminated under circumstances that raise an inference of unlawful disability discrimination." *Mole v. Buckhorn Rubber Products*, 165 F.3d 1212, 1216 (8th Cir. 1999); *Nesser v. Trans World Airlines*, 160 F.3d 442, 445 (8th Cir. 1998); *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 598 (8th Cir. 1998); *Webb v. Mercy Hospital*, 102 F.3d 958, 959-60 (8th Cir. 1996).  The burden shifts to Convergys to articulate a legitimate, non-discriminatory reason for its employment decision *only* if Plaintiffs establishes the elements of the prima facie case.  *Nesser*, 160 F.3d at 445.  If Convergys meets its burden, the Plaintiffs then bear the burden of demonstrating that the employer's reason is a pretext for discrimination.  *Id.*  However, at all times, "[t]he plaintiff bears the ultimate burden of demonstrating that discrimination was the real reason for the employer's action."  *Id.  See also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If Plaintiffs are unable to establish any element of the prima facie case, summary judgment is proper. *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998); *Nesser*, 160 F.3d at 445; *Weber v. American Express Co.*, 994 F.2d 513, 515-16 (8th Cir. 1993). Because Plaintiffs are unable to establish that Demirelli was qualified with or without reasonable accommodation, this Court should grant summary judgment in favor of Convergys.  Even if Plaintiff is considered disabled and otherwise qualified under the Americans With Disabilities Act, Convergys legitimately acted in response to Plaintiff's extraordinary violations of the company's attendance policies– not with any discriminatory intent.  Convergys dismissed Plaintiff only because Plaintiff failed to perform according to Convergys' attendance standards, even after he was accommodated.  (Facts ¶¶ 57, 59, 76).

**B.     *Plaintiffs Cannot State a Claim Because Demirelli Is Not Qualified, With or Without Reasonable Accommodations.***

Plaintiff's claim of discrimination fails because he is unable to prove he was qualified, with or without reasonable accommodation.  In order to state a claim for relief under the ADA, Plaintiff bears the burden of demonstrating that he can perform the essential functions of his job with or without reasonable accommodation. *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d at 598.  A "qualified individual with a disability" is defined, in relevant part, as:  "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(9). The plaintiff bears the burden of proof on this issue; he must be able to show that he is a "qualified individual with a disability" at the time of the employment decision  in order to successfully pursue an ADA claim. *Nesser v. Trans World Airlines*, 160 F.3d at 445 (8th Cir. 1998).  *See also* 29 C.F.R. app. § 1630.2(m).

To be a "qualified individual" entitled to ADA protection, "a plaintiff must show that his work performance met the employer's legitimate job expectations." *Wilking v. County of Ramsey*, 153 F.3d at 873(internal quotation omitted). There is no genuine issue of fact that Demirelli is not qualified: Demirelli was unable to be punctual and was, in fact, tardy 102 times in the year prior to his dismissal. (Facts ¶ 48). Further, for at least 8 months of his 18 month employment he was not legally authorized to work under federal immigration law. (Facts ¶ 53).

1.     ***Punctuality Is An Essential Function of the Position of Customer Service and Problem Resolution Representative at Convergys***

It is undisputed that reliable attendance and punctuality are essential functions of the position of Customer Service and Problem Resolution Representative (also known as "Associate" or "Agent") at Convergys. (Facts ¶ 17-25). Convergys' attendance policy, which Demirelli received, specifically states that the company expects Agents "to show up for work on-time every day." (Facts ¶ 14). Convergys' fulfillment of its contractual obligations to its customers is dependent, on large part, on the punctuality of its Agents. (Facts ¶ 19-23). Agents are scheduled based on forecasted call volume. Tardiness on an Agent's part may result in client customers experiencing longer hold times and increase the rate of call abandonment. The repercussions are significant: Convergys may be required, in some instances, to refund clients for failing to meet these expectations. (Facts ¶ 18-23). As LaShonDa Aldridge, Demirelli's former supervisor testified "The way the nature of our business works is that we have to have bodies in seats at particular times of the day to service customers. We have contractually agreed with [our client] that we would answer a certain percentage of their calls within a minute, within 60 seconds, or at the particular time we are in jeopardy" of breaching the company's agreement with the customer. (Facts ¶ 23). And, the margin of error is small. Convergys' failure to meet

its clients expectations in only three half-hours in a day is considered the loss of an entire day. (Facts ¶ 21).

Convergys takes extensive measures to ensure that Agents are present and available to take customer calls as scheduled. Agents are required to log into an electronic timekeeping system when they arrive to work. They are monitored daily to ensure that they are present on the phone systems when scheduled. (Facts ¶ 24). And, Agents are subject to an attendance policy which called for termination upon the accrual of 14 tardies. (Facts ¶ 14).

The importance of punctuality at Convergys was no surprise to Demirelli. He received and read the Associate Guide which expressly stated that he was expected to be on time to work, every day. (Facts ¶ 14). He admitted that he understood it was important to be punctual, and he was aware that progressive discipline would ensue if he was tardy. (Facts ¶ 25). Demirelli was provided resources to keep track of his tardies. (Facts ¶ 28).

And, throughout Demirelli's employment he was repeatedly counseled about the importance of timeliness. In August 2001 Demirelli received a written review counseling him on his accrual of 4 tardies, which he signed. (Facts ¶ 30). Three months later, in November 2001 Demirelli received a verbal warning for accruing 10 tardies between June 2001 and October 2001. (Facts ¶ 31). Demirelli admits that he understood at the time that he was subject to termination upon the accrual of just four more tardies. (Facts ¶ 32).

In March and April 2002 Marlon Mitchell issued Demirelli 3 written warnings for attendance violations, including a written warning counseling Demirelli that he had incurred 18 tardies – 4 more than tolerated under Convergys' attendance policy. (Facts ¶ 39-43). Demirelli knew his attendance problem was serious and that he was subject to termination. (Facts ¶ 41).

And, in April 2002 Marlon Mitchell specifically advised Demirelli that "one more occurrence may result in termination."  (Facts ¶ 45).

Demirelli's conduct demonstrates that he understood the importance of punctuality.  For the first six months of Demirelli's employment, he was never tardy.  (Facts ¶ 29).  And, for an entire month following his November 2001 verbal warning, Demirelli was consistently punctual. (Facts ¶ 33).

The undisputed facts, demonstrate that punctuality is an essential function of the Agent position at Convergys.  *See, e.g. Depaoli v. Abbott Laboratories*, 140 F.3d 668 (7th Cir. 1998). Further, the EEOC acknowledges the importance of punctuality.  Plaintiff EEOC has taken the position in advisory opinions that, in accommodating disabled employees, "An employer does not have to tolerate chronic lateness, lower job performance standards, or eliminate essential job functions."  Guidance Letter from Peggy R. Mastroianni, Associate Legal Counsel, U.S. Equal Employment Opportunity Commission, July 8, 1997  (attached as Ex. L).

The Eighth Circuit has consistently affirmed summary judgment in favor of employers who enforce their attendance policy, holding that "regular and reliable attendance is a necessary element of most jobs"  *Pickens v. Soo Line Railroad*, 264 F.3d 773, 777 (8th Cir. 2001).  In *Pickens*, the Eighth Circuit affirmed summary judgment and held that the disabled plaintiff-employee  was not qualified under the ADA because he could not adhere to the company's attendance policy. Specifically, the Plaintiff was absent 29 times during a 10 month period.  "'An employee who is unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones."  *Id.* (*quoting Moore v. Payless Shoe Source, Inc.*, 187 F.3d 845, 848 (8th Cir.), *cert. denied,*  528 U.S. 1050 (1999)).  *See also Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 850 (8th Cir. 2002)(*affirming*

summary judgment and holding that employee was not qualified under the ADA because plaintiff's absenteeism and persistent tardiness prevented her from performing essential functions of taking phone calls and answering inquiries from other banks); *Maziarka v. Mills Fleet Farm, Inc.*, 245 F.3d 675, 681 (8th Cir. 2001)(*affirming* summary judgment for employer, holding that an employee's requested accommodation for later make up time missed for frequent leaves of absence was not a reasonable alternative).

In the face of both the EEOC's stated legal position on this issue and the clear Eighth Circuit precedent denying plaintiffs' claims with far less egregious circumstances, there can be no dispute that punctuality is an essential job function.

### 2. *Plaintiffs Cannot Show that Demirelli Was Qualified Because He Was Still Chronically Tardy Even When Accommodated.*

"[T]he ADA does not require an employer 'to change the essential nature of the job' in order to accommodate" the employee's disability." *Mole v. Buckhorn Rubber Products, Inc.*, 165 F.3d at 1218 (*quoting Boelman v. Manson State Bank*, 522 N.W.2d 73, 81 (Iowa 1994)).  In order to establish that Demirelli is qualified with or without accommodations, Plaintiffs must show that Demirelli would have been punctual had he received the accommodations he claims were denied.  A bare assertion by the Plaintiffs, standing alone, is insufficient to establish that Demirelli is qualified to perform the function.  *Basith v. Cook County*, 241 F.3d 919, 931 (7th Cir. 2001).

Plaintiffs cannot meet their burden.  It is undisputed that by April 15, 2002, Demirelli received all of the accommodations he asked for:  his parking problems were resolved by receiving a later start time and his problems finding a seat or headset were fully resolved by virtue of Demirelli receiving a seat to work in a training area of the production floor.  (Facts ¶¶ 59, 76).  Yet, even after Demirelli received all of these accommodations, he was *still* late 17

times in the last two months of his employment, far more than allowed under Convergys'

attendance policy for an entire one year period.  (Facts ¶ 98).  Further, given that the lunch

tardies incurred after Demirelli received his other accommodations were wholly unrelated to his

arrival time at work (the only time when parking would be at issue), Demirelli cannot show that

an assigned parking space would have been effective in ameliorating his tardiness.  (Facts ¶ 76).[7]

*See, e.g. Valdez v. Steiner Corp.*, 2004 U.S. Dist. LEXIS 14031 (N. D. Ill. 2004) (attached as Ex.

M)(*affirming* summary judgment and holding that handicapped parking space was not a

reasonable accommodation because the plaintiff could not prove that the space would allow him

to perform the essential functions of the job).

The *only* requested accommodation Demirelli did not receive was an assigned parking

space.  (Facts ¶ 59, 65, 78).  It is undisputed that Convergys considered his request but

determined that Demirelli's parking problems could be resolved by changing his start time to a

static 4:30 p.m. when the parking lot was less congested.  (Facts ¶ 60-69).

It is well settled that a plaintiff employee cannot state a claim under the ADA merely

because he does not receive his preferred accommodation; rather it is the "employer's

prerogative to choose a reasonable accommodation.  *Jay v. Intermet Wagner, Inc.*, 233 F.3d

1014, 1017 (7th Cir. 2000).  *See Webster v. Henderson*, 32 Fed. Appx. 36, 43-44 (4th Cir.

2002)(*holding* that plaintiff employees could not state a claim for failure to accommodate their

disabilities where they claimed the lack of parking spaces made their light duty job unacceptable.

"The record reflects that other employees worked night shifts and that parking was not

---

[7] Notably, Demirelli was tardy arriving to work 19 times on Sundays, when the other tenants of the shopping center were closed and Convergys operated on a skeleton crew.  Demirelli clearly had an abundance of available parking, yet he still could not manage to report to work on time.  (Facts ¶ 49).

guaranteed for any postal employee.  Plaintiffs cannot seek another form of accommodation when the type of accommodation chosen by the employer is reasonable.")

And, in fact, Convergys' alternative accommodation was effective.  After the schedule change Demirelli was *never* late arriving to work.  (Facts ¶ 68).  All of Demirelli's tardies after April 15, 2002 resulted from his failure to return from his meal break.[8] (Facts ¶ 76).  In *Kiel v. Select Artificals, Inc.*, 169 F.3d 1131 (8th Cir. 1999) the Eighth Circuit noted that "if more than one accommodation would allow the individual to perform the essential functions of the position," the employer "may choose the less expensive accommodation or the accommodation that is easier for it to provide."  *Id.* at 1136-37 (*quoting* 29 C.F.R. § 1630.9 (Appendix (1998))).

The only other accommodation Plaintiffs assert that Demirelli did not receive was the right to have his tardies forgiving or to work late to make up time missed from his tardiness in returning from meal breaks.  (Facts ¶ 81, 82).  Plaintiffs cannot state a claim for this accommodation because (1) plaintiff never requested this accommodation and (2) even if he had requested the ability to work past his scheduled start time, the accommodation was not reasonable.

In general, it is the disabled employee's responsibility to inform the employer that a specific accommodation is needed.  *Mole v. Buckhorn Rubber Products, Inc.*, 165 F.3d at 1217 (8th Cir. 1999).  An employer is not expected to "read his mind and know he secretly wanted a particular accommodation, and then sue the employer for not providing it."  *Ferry v. Roosevelt Bank*, 883 F.Supp. 435, 441 (E.D.Mo. 1995).  When the necessary reasonable accommodation is "not open, obvious and apparent to the employer" the initial burden rests primarily on the

---

[8]  Demirelli's lack of reserved parking obviously did not affect his tardiness returning from meal breaks.  Demirelli never left Convergys' premises during meal breaks.  He, like the other employees at Convergys, used Convergys' cafeteria facilities for meal breaks. (Facts ¶ 13).

employee to suggest a reasonable accommodation. *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998).

Demirelli admits that he never requested a longer meal period. (Facts ¶ 77). And, consistent with that his supervisor, LaShonDa Aldridge did not consider providing him with a longer lunch period. As Ms. Aldridge testified, it was not obvious to her, nor did she assume, that Demirelli needed an extended lunch period as an accommodation for his confinement to a wheelchair. (Facts ¶ 78).

Even if Demirelli had requested an extended lunch break and the ability to make up his tardies by working later in his shift, such an accommodation was not reasonable. First, Demirelli was scheduled to work from 4:30 p.m. to 1:00 a.m. at which time the project shut down for the day. (Facts ¶ 10). There was no additional time in the day for Demirelli to work past his scheduled end time to make up for his tardies.

Second, Demirelli's request for forgiveness of his tardiness and the right to make up his tardiness is unreasonable. As LaShonDa Aldridge testified, "The way the nature of our business works is that we have to have bodies in seats at particular times of the day." (Facts ¶ 23). Convergys cannot permit employees to come and go as they please. To do so would undermine a fundamental business principle upon which Convergys must operate – specifically staffing projects based on forecasted call volume. (Facts ¶ 18-22). A request that an employee effectively come and go as he pleased would force Convergys to eliminate the essential job function of punctual attendance.

It is well settled that an employer is not obligated to accommodate away an essential job function. *Maziarka v.Mills Fleet Farm, Inc.*, 245 F.3d at 681-82. Like Demirelli, Maziarka claimed that he should have been accommodated for by receiving time off without pay or to

make up the missed work time later.  Noting that "dependable attendance is often an essential part of a job", the Court found that the plaintiff's job required that he be capable of regular and predictable attendance at a specified location in order to perform the tasks of a receiving clerk." *Id.* at 681.  Affirming summary judgment, the Court held that make-up time was not a reasonable accommodation:

> His proposed accommodation does not address the crucial problem – the unpredictability of Maziarka's absences – which left Fleet Farm unable to rely on its schedule in order to efficiently receive and process merchandise.  His proposal instead presumes that regular, predictable attendance is not an essential function of his job.  "It is well settled that an employer is under no obligation to reallocate the essential functions of a position that a qualified individual must perform.

*Id.* (*quoting Moritz v. Frontier Airlines, Inc.*, 147 F.3d 784, 788 (8th Cir. 1998)).

Likewise, in *Buckles v. First Data Res., Inc.*, 176 F.3d 1098 (8th Cir. 1999), the Eighth Circuit reversed the District Court's denial of summary judgment where the employee was chronically absent from his job.  Although the Plaintiff argued that he was qualified to perform the duties with the accommodation of leaving work at any time an air-borne irritant aggravated his condition, the Court disagreed.  The Court held that "[u]nfettered ability to leave work at any time is certainly not a reasonable accommodation" and an employer is not required by the ADA to provide an unlimited absentee policy.  *Id.* at 1101.  *See also Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)(*affirming* summary judgment for employer and *holding* that ability to clock in at whatever time plaintiff arrived without reprimand and permit her to make up missed time at end of a shift is not a reasonable accommodation.  "A request to arrive at work at any time, without reprimand, would in essence require Appellee to change the essential functions of Appellant's job, and thus is not a request for a reasonable accommodation.").

### 3.     Summary Judgment Is Consistent With Prior Precedent Examining Indistinguishable Facts.

An employee who cannot comply with his employer's legitimate punctuality expectations cannot, as a matter of law, show that he is qualified under the ADA.  In virtually identical facts, the Eleventh Circuit affirmed summary judgment in favor of the employer and held that the plaintiff-employee could not state a claim under the ADA because she was not qualified.  In *Earl v. Mervyns, Inc.*, 207 F.3d 1361, the Court held, *inter alia*, that punctuality was an essential job function and that the employee who could not meet the employee's punctuality expectations could not be qualified.  *Id.* at 1366. In *Earl*, the employer had an attendance policy that allowed employees 15 tardies in a one year period.  Like Convergys, the employer in *Earl* had a three-tiered disciplinary system, which ended in termination.  *Id.* at 1364  The plaintiff-employee had been tardy 29 times within the year, nearly double the tolerance of the policy and was late another four times while in corrective action.  The plaintiff claimed that she should have been allowed to clock in whenever she was able, and work beyond her scheduled shift to make up time at the end of her shift.  Even after Plaintiff received schedule changes to accommodate her disability, she was still tardy, and was ultimately terminated for tardiness upon incurring approximately 40 tardies in the one year period.  *Id.* at 1364-65.

The Eleventh Circuit rejected the plaintiff-employee's claims and held that punctuality was an essential function of the job, because (1) the employer placed a "high priority" on punctuality, (2) the company had a punctuality policy with a system of warnings, (3) the company articulated adverse consequences for tardiness and (4) the employee had received counseling on several occasions about her tardiness.  *Id.* at 1366.

And, in *Ceasar v. United Services Auto. Ass'n.*, the Fifth Circuit affirmed summary judgment on behalf of plaintiff's employer, holding that she was not qualified because she could

not adhere to the company's attendance policy.  102 Fed. Appx. 859 (5th Cir. 2004)(attached as Ex. N). The plaintiff was responsible for handling incoming calls from potential and existing customers.  She incurred 22 unscheduled absences in 3 months and was thereafter admonished about the necessity of her timely presence at work.  After receiving her warning, the plaintiff incurred another 5 unscheduled absences.  Providing her with another opportunity to improve, the employer placed the plaintiff on probation, and she again incurred other unscheduled absence.  The Fifth Circuit, specifically noting that attendance was essential where plaintiff was responsible for handling incoming calls, held that the plaintiff was not qualified under the ADA and affirmed summary judgment.  *Id.* at 860.

The circumstances in this case are almost indistinguishable from the prior precedent rejecting the plaintiffs' claims under the ADA.  Demirelli was well aware of his obligation to be punctual.  He managed to report to work and return from lunch on time every day for six months, but then progressed to a pattern of persistent tardiness.  (Facts ¶ 29).  When faced with disciplinary action, he attributed his tardiness to problems with parking and finding assigned seating.  (Facts ¶ 31, 60).  After that was resolved, he still was persistently late returning from lunch, yet never requested accommodations for resolving his lunchtime tardiness.  (Facts ¶ 76-77). Once he did, albeit too late, he could not proffer a reasonable accommodation, only a suggestion that the Company "forgive" his tardiness and ignore the policy with respect to him. (Facts ¶ 81).  Demirelli, therefore, was not qualified, with or without reasonable accommodation. Because Plaintiffs' cannot meet this burden, this Court should grant summary judgment in favor of Convergys.

**4.      *Demirelli Was Not Qualified, With or Without Accommodations Between September 10, 2001 and April 5, 2002 Because He Failed To Maintain Authorization to Work in the United States as a Noncitizen.***

It is undisputed that, from September 10, 2001 to April 5, 2002, Demirelli was not legally authorized to work in the United States.  (Facts ¶ 53, 54).  The Immigration Reform and Control Act of 1986 prohibits workers from engaging in employment without authorization.  8 U.S.C.A. § 1324a.  Because Demirelli lacked employment authorization during this time period he cannot show he was qualified under the Americans with Disabilities Act.  *See Egbuna v. Time-Life Libraries, Inc.*, 153 F.3d 184, 186 (4th Cir. 1998).

Like Demirelli, the plaintiff in *Egbuna* possessed valid employment authorization at the time he was hired.  However, his employment authorization expired six months later and he continued to work for the defendant employer for three years thereafter.  *Id.* at 185.  When Egbuna participated in an EEOC investigation on a harassment complaint, he voluntarily resigned and reapplied thereafter.  At the time he reapplied, he did not have employment authorization.  The District Court granted summary judgment holding, among other things, that the plaintiff was not qualified for the position sought because he did not have employment authorization at the time he was rejected for rehire.  *Id.*

Because Demirelli was not qualified to work from September 10, 2001 to April 5, 2002 Plaintiffs cannot state a claim for any actions of Convergys during that time period – including any claim that it failed to accommodate him.   Plaintiffs must show that Demirelli was qualified to perform the job *at the time of the employment decision.  Hatchett v. Philander Smith College*, 251 F.3d 670, 674-675 (8th Cir. 2001); Appendix to 29 C.F.R.§ 1630.  Because Demirelli was not qualified *as a matter of law* between September 10, 2001 and April 5, 2002, Plaintiffs cannot raise any claim against Convergys during that time period.

32

Notably, Plaintiffs do not dispute that by at least April 15, 2002 only ten days after Demirelli resumed status as an authorized worker, Demirelli had already been accommodated with respect to every issue he raised with Convergys:  his shift was changed to accommodate his parking issues, he had a reserved seat that alleviated his need to seek an available seat, and his new seating arrangement ensured that he always had a headset at the time he commenced work. (Facts ¶ 76).  And, even after he resumed work-authorized status and was accommodated by Convergys, he was tardy 17 times in less than three months – more violations than the attendance policy tolerated for an entire  365 day period.[9]  (Facts ¶¶ 14, 76).  Therefore, he cannot show he is qualified, with or without accommodation.

## C.  Convergys Had a Legitimate, Non-Discriminatory Reason for Dismissing Plaintiff.

Even if Demirelli was qualified, Convergys' dismissal of Demirelli for violation of the company's attendance policy was legitimate and non-discriminatory.  Plaintiffs bear the burden, at all times, of demonstrating that Demirelli's dismissal raises "an inference of unlawful disability discrimination."  *Mole v. Buckhorn Rubber Products*, 165 F.3d at 1216.  In addition, even if Plaintiffs present sufficient proof of a prima facie case, which they cannot, to avoid summary judgment they must demonstrate that Convergys' legitimate reason for Demirelli's discharge was pretextual, that "a discriminatory animus lies behinds its neutral explanations." *Id.* at 1218 (*quoting Wilking v. County of Ramsey*, 153 F.3d at 874.

---

[9] It is immaterial whether Convergys was aware of or considered Demirelli's lack of employment authorization at the time it made any of its employment decisions.  As the Eleventh Circuit recently held, even if the employer was not aware of factors that would have disqualified plaintiff's employment, it still should be considered at the prima facie stage because it was a bar to plaintiff's employment and therefore, germane at the prima facie stage. *Underwood v. Perry County Comm'n*, Case No. 04-11713 (11th Cir. July 21, 2005)(attached as Ex. P)(affirming summary judgment for employer in a sex discrimination failure-to-hire case where after-acquired evidence showed that plaintiff had speeding tickets that disqualified her from employment, even though the defendant was not aware of the tickets at the time it decided not to hire her).

Demirelli concedes that he was terminated for tardiness. (Facts ¶ 57). And, he admits that he was tardy approximately 102 times in the year prior to his dismissal. (Facts ¶ 48). The law is well-settled that termination as a result of an attendance policy is legitimate and non-discriminatory, precluding a plaintiff's claims of discrimination. In *Marxkors v. GTE Wireless, Inc.*, the Eighth Circuit affirmed Eastern District Court Judge Carol E. Jackson's grant of summary judgment on behalf of the employer, holding that that plaintiff's poor attendance and punctuality were legitimate, non-discriminatory reasons for termination. 19 Fed.Appx. 476 (8th Cir. 2001)(unpublished, attached as Ex. O). Also, in *Robinson v. Barnes Hospital*, the Eighth Circuit affirmed this Court's grant of summary judgment in a race discrimination case, holding that termination as a result of the plaintiff employee's violations of the employer's attendance policy was a legitimate, non-discriminatory reason for termination. 210 F.3d 379 (8th Cir. 2000). Similarly, in *Price v. S-B Power Tool*, the Eighth Circuit held that violations of the employer's attendance policy was a legitimate, non-discriminatory reason for termination in a disability discrimination case. 75 F.3d 362 (8th Cir. 1996).

When reviewing Convergys' articulated reasons for its employment actions, the court "'do[es] not sit as a super-personnel department that reexamines an entity's business decisions … Rather, [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior.'" *Wilking v. County of Ramsey*, 153 F.3d at 873 (8th Cir. 1998)(*quoting Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 973 (8th Cir. 1994)). Therefore, the court only looks to whether the employer's articulated decision was true, and not whether the reason was ultimately wise, fair or even correct. *Wilking*, 153 F.3d at 873. Thus Plaintiff cannot overcome summary judgment merely by contending that his infractions were not serious enough to warrant discharge. Such a contention "merely questions the soundness of defendant's judgment, and

34

does not demonstrate pretext for discrimination." *Mole v. Buckhorn Rubber Products*, 165 F.3d at 1219 (*affirming* summary judgment for employer where plaintiff with MS alleged she was dismissed in violation of the ADA and MHRA) (*quoting Wilking*, 153 F.3d at 874).

Plaintiff does not dispute that he was terminated because of his tardiness, and for no other reason. Consistent with the well-settled precedent of the Eighth Circuit, summary justment should be entered in Convergys' favor because Plaintiff cannot raise a genuine issue of material fact that his dismissal was legitimate and nondiscriminatory.

**D.    *Plaintiffs are Not Entitled to the Remedies Sought.***

**1.    *Demirelli is Not Entitled to Backpay***

It is undisputed that between September 10, 2001 and April 5, 2002 and since at least April 23, 2003 Demirelli had no legal right to work in the United States. (Facts ¶ 53). It also is undisputed that Demirelli has done anything since April 2003 to obtain the legal right to work in the United States. Today Demirelli has no legal right to in the United States. *Id.*

The Supreme Court precludes an award of backpay where the employee is not legally authorized to accept employment in the United States. *Hoffmann Plastic Compounds, Inc. v. National Labor Relations Board,* 535 U.S. 137, 151 (2002). Expanding the Supreme Court's prior precedent, which only tolled backpay during any period that the employee was not legally authorized to work in the United States, the Court in *Hoffmann* excluded backpay completely to employees who lacked employment authorization. *Id.* (citing *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984)). To allow employees who lack employment authorization to collect backpay would "encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations." *Id.* at 152.

Because Demirelli was working without employment authorization for 8 of his 18 month employment, and he has not held employment authorization since April 2003, he is not, as a

matter of law, entitled to back pay.  (Facts ¶ 53-55).  *See also Escobar v. Spartan Security Service*, 281 F.Supp.2d 895 (S.D. Tex. 2003)(plaintiff conceded and Court acknowledged plaintiff was not entitled to back pay given the Court's decision in *Hoffmann*, where although the plaintiff held employment authorization at the time of hire, the employment authorization lapsed and plaintiff did not renew).[10]

### 2.    *Plaintiff is Not Entitled to Reinstatement or Frontpay*

It is undisputed that Demirelli has not held, nor applied for, employment authorization since April 2003.   (Facts ¶ 55).  As a result, at the time of the filing of this motion, Demirelli is precluded as a matter of law from receiving reinstatement or frontpay.  As previously discussed, Demirelli's failure to maintain authorization to work for a U.S. employer precludes any remedy he may have for rehire.  8 U.S.C. § 1324a.  The Supreme Court's decision in *Hoffmann Plastics* clearly forbids the remedy of reinstatement where the individual is not legally authorized to engage in employment in the United States. 535 U.S. 137 at 138 (*holding* that an employee could not be held to be "available" for work while the employee was not lawfully entitled to be employed in the United States).

---

[10] Plaintiff's failure to acquire employment authorization to allow him to obtain comparable employment following his dismissal also precludes a finding that Demirelli mitigated his damages.  It is well-settled that "A party harmed by discriminatory employment decisions has an affirmative duty to mitigate his damages by reasonably seeking and accepting other substantially equivalent employment." *Hartley v. Dillard's, Inc.* 310 F.3d 1054, 1061 (8th Cir. 2002).  A successful employment discrimination plaintiff must show that she attempted to mitigate damages or face a reduction in the damage award. *Denesha v. Farmers Ins. Exch.,* 161 F.3d 491, 502 (8th Cir. 1998). This duty requires that the plaintiff use reasonable diligence in finding suitable employment if the claimant was not reasonably diligent in seeking other employment and that with the exercise of reasonable diligence there was a reasonable chance that the claimant might have found comparable employment. *EEOC v. Ilona of Hungary, Inc.,* 108 F.3d 1569, 1581 (7th Cir. 1997).  It is undisputed that Demirelli did not hold employment authorization after April 2003, and took no steps to ensure that he was legally authorized to work should employment opportunities be made available to him.  (Facts ¶¶ 53-55).  Clearly, if Demirelli were taking reasonable steps to find suitable alternative employment, he would have made himself legally authorized to accept such employment.

## IV. CONCLUSION

The undisputed facts clearly support summary judgment in favor of Convergys. Demirelli was not qualified and therefore he cannot state a claim under the ADA. Even when Convergys provided Demirelli with accommodations on the issues he raised, he still did not report to work as scheduled in a position where punctuality is essential. Further, Demirelli's failure to maintain legal authorization to work in the United States precludes a finding that he was qualified during that time period and precludes him from a significant portion of the remedies sought. Convergys, therefore, respectfully requests that this Court GRANT summary judgment in favor of Convergys.

WHEREFORE, for the foregoing reasons, Defendant Convergys Customer Management Group Inc. respectfully requests that this Court GRANT its Motion for Summary Judgment.

Respectfully submitted,

THOMPSON COBURN LLP

By   /s/  Laura M. Jordan
     Mary M. Bonacorsi, #2669
     Laura M. Jordan, #101022
     One U.S. Bank Plaza
     St. Louis, Missouri  63101
     314-552-6000
     FAX 314-552-7000

Attorneys for Defendant, Convergys Customer
Management Group Inc.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Memorandum In Support of Motion for Summary Judgment was served electronically with the Clerk of the Court this 30th day of September, 2005 to be served by operation of the Court's electronic filing system upon Barbara Seeley, Equal Employment Opportunity Commission 1222 Spruce Street, Room 8.100, St. Louis, MO 63103 and via first class U.S. mail, postage prepaid, to Michael Fagras, Attorney for Ahmet Demerelli, 4700 Mexico Road, St. Peters, MO 63304.

_____/s/ Laura M. Jordan_____
