# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AHMET YIGIT DEMIRELLI,[1] | ) | |
| | ) | |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | No. 4:04-CV-846 CAS |
| | ) | |
| CONVERGYS CUSTOMER MANAGEMENT GROUP, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the parties' cross motions for summary judgment. For the following reasons the Court will grant in part and deny in part defendant's motion for summary judgment and deny plaintiff's motion for summary judgment without prejudice.

## I. Background

The Equal Employment Opportunity Commission ("EEOC") filed this complaint against defendant Convergys Customer Management Group, Inc. ("Convergys").[2] The complaint alleges that Convergys violated Title I of the American with Disabilities Act of 1991, 42 U.S.C. § 12112(a)

---

[1]Plaintiff-Intervener Ahmet Yigit Demirelli's name is spelled various ways in the complaint and motions filed by both parties. Plaintiff EEOC has confirmed to the Court that the correct spelling is Demirelli, not Demerelli, and the Court will use the correct spelling.

[2]The EEOC is authorized to bring this action pursuant to 42 U.S.C. § 12117(a), which incorporates by reference 42 U.S.C. § 2000e-5(f)(1).

("ADA"), by committing unlawful employment practices with respect to its former employee Ahmet Demirelli by failing to provide reasonable accommodation for Demirelli's disability and terminating Demirelli because of his disability.   Demirelli was granted leave to intervene in this action on December 10, 2004.

The EEOC and Convergys filed cross motions for summary judgment.   In its motion, Convergys asserts that Demirelli is not qualified with or without reasonable accommodation for his job and that his dismissal was legitimate and non-discriminatory.   The EEOC asserts in its motion that it is entitled to partial summary judgment because the undisputed facts show that Convergys's affirmative defense of after-acquired evidence fails as a matter of law.

## II.  Summary Judgment Standard

The standards applicable to summary judgment motions are well settled.   Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."   See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The initial burden is placed on the moving party.   City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor).   Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on a material factual issue.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of

material fact exists. Fed. R. Civ. P. 56(e); Herring v. Canada Life Assur. Co., 207 F.3d 1026, 1029 (8th Cir. 2000). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Herring, 207 F.3d at 1029 (quoting Anderson, 477 U.S. at 248). A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. See Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." Armour and Co., Inc. v. Inver Grove Heights, 2 F.3d 276, 279 (8th Cir. 1993)

In passing on a motion for summary judgment, it is not the court's role to decide the merits. The court should not weigh evidence or attempt to determine the truth of a matter. Rather, the court must simply determine whether a genuine issue of material fact exists. Bassett v. City of Minneapolis, 211 F.3d 1097, 1107 (8th Cir. 2000).

The Eighth Circuit has stated that summary judgment should seldom be used in cases alleging employment discrimination. Kells v. Sinclair Buick - GMC Truck, Inc., 210 F.3d 827, 830 (8th Cir. 2000). Summary judgment is not appropriate in employment discrimination cases unless all the evidence points one way and is susceptible of no reasonable inference of discrimination. Breeding, 164 F.3d 1151, 1156 (8th Cir. 1999) (citation and internal quotation omitted). Summary judgment is appropriate, however, if the plaintiff has failed to present evidence sufficient to create a jury question as to an essential element of his claim. Whitley v. Peer Review Sys., Inc., 221 F.3d 1053, 1055 (8th Cir. 2000) (citing Chock v. Northwest Airlines, Inc., 113 F.3d 861, 865 (8th Cir. 1997)).

### III. Facts

#### A. Background

The Court accepts the following facts as true for purposes of summary judgment. Yigit Demirelli suffers from Osteogenesis Imperfecta, commonly known as brittle bone disease.[3] As a result, Demirelli has had approximately fifty fractures and his teeth are in very poor condition. He is not able to walk and uses a manual wheelchair. He is not supposed to lift heavy weights or wheel his chair around excessively. He has difficulty opening doors. He suffers from pain on a regular basis.

At the time he was hired by Convergys, Demirelli had graduated from high school and completed a semester at the University of Missouri St. Louis. Demirelli was employed by Convergys from January 15, 2001 until June 27, 2002 as a Customer Service and Problem Resolution Representative ("Agent" or "Associate").

Convergys is located at the Village Square Shopping Center in Hazelwood, Missouri. Convergys serves as an in-bound call center handling calls from customers of Convergys's clients. For example, if a company set up a "1-800" number for customers to participate in a promotion or for customer service assistance, Convergys would contract with that company to accept those in-bound calls. Because Convergys is hired to take calls directed to its clients, it is necessary that Convergys sufficiently staff its projects to meet projected call volume. Employees are scheduled to work based on the company's business needs and projected call volume. To determine the necessary

---

[3]Osteogenesis imperfecta is a "condition marked by defective bone formation, and hence, fragility of the bones. Fractures occur without excessive strain or violence, in childhood, infancy, or even before birth." 4 J.E. SCHMIDT, ATTORNEYS' DICTIONARY OF MEDICINE AND WORD FINDER 117 (2004).

level of staffing, Convergys's clients provide the company data forecasting call volume. Therefore,

Convergys is expected to appropriately staff the project to handle the forecasted call volume.

At all times during Demirelli's employment, Convergys had a policy regarding reasonable

accommodations for disabled employees. The policy stated:

> Federal regulation and Convergys policy require that reasonable accommodations be made for physical and mental disabilities of qualified employees and applicants in all aspects of employment when a need is identified. Hires, transfers, upgrades, or promotions may not be denied to individuals with disabilities because of the need to make reasonable accommodations.
>
> The extent of Convergys'[sic] accommodation obligations and the reasonableness of any particular accommodation are determined on a case-by-case basis, considering various factors, including cost, the organization's size, and the effect on how work is performed. Convergys requests advice and assistance from both internal and external sources when exploring the feasibility of structural and nonstructural accommodations.

(Demirelli's Dep. Ex. 25 ). Convergys's Code of Business Conduct provides:

> Convergys is committed to providing a work environment that is free from unlawful discrimination. . . . Specifically, Convergys is committed to a work environment that is free from discrimination on the basis of race, religion, color, creed, national origin, age, sex, disability, veteran status, or other unlawful factors. . . . If you have complaints of discrimination . . . report it to your supervisor or Human Resources representative. Complaints of offensive or improper conduct are taken seriously and investigated thoroughly.

(Demirelli's Dep. Ex. 22). Demirelli acknowledged receiving these documents.

## B. Demirelli's Working Environment

### 1. Schedule

Convergys hired Demirelli to provide technical support to digital subscriber line ("DSL")

customers of a Convergys client. Demirelli worked on the evening shift. Generally, agents employed

by Convergys do not work on a fixed shift. Instead, they work a flexible schedule with start times

beginning in fifteen minute increments, which varied depending on the projected call volume.

Demirelli received a thirty minute lunch break with a three minute grace period for returning from lunch.  Demirelli remained on Convergys's premises for meal breaks.

### 2.  Parking

Demirelli lived about twenty to twenty-five minutes from Convergys.  At first, he left for work approximately forty-five minutes before his start time in order to get to work on time.  Later he left home an hour before his start time in order to get to work on time.  Even when Demirelli left for work an hour before his start time, sometimes he was tardy.  When he told his supervisors that he had left an hour early but had a problem find parking, he was told to leave for work earlier.

Convergys's busiest time of the day in terms of call volume was from 2:00 pm to 6:00 p.m.  During that time, Convergys scheduled the most agents to work.  When Demirelli came to work at or around 3:00 p.m., there was a lot of congestion.  At the time Demirelli worked for Convergys, the shopping center where Convergys is located had two handicapped parking spaces which were marked "van-accessible," meaning they were large enough for a handicapped van to be parked there.  Demirelli drove a handicapped van which had a motorized lift to allow him to get in and out of the van in his wheelchair.   Because he had difficulty finding a vacant parking space to park his van, Demirelli usually parked some distance away from Convergys.

### 3.  Seating

For at least two months beginning in January 2001, while Demirelli was supervised by Loretta Hill, he received an assigned workstation near Hill and the door.  Demirelli's name was on the cubicle.  If someone was sitting in Demirelli's workstation when he arrived at work, he would tell Hill and she would make the person move to another workstation.  After approximately two months, Demirelli moved to another workstation.  In the second workstation, people began sitting in Demirelli's workstation again and eventually he was told to find any open seat.  By April 18, 2002,

Demirelli was sitting in a third workstation that was available to him every day located approximately five to ten feet from the entrance of the work area. Demirelli stated this third workstation was the most accessible place to sit where he had the least difficulty getting to the door. This third seat was located in the training area and Demirelli's use of the workstation was not approved by his supervisors.

### 4. Headsets

When an agent reported to work, he logged on to his computer which was connected to the timekeeping system ("TKS"). The agents also logged on to their telephones, which were connected to the call management system ("CMS"). Agents at Convergys are required to use a headset in order to log on to the phone system. It was not necessary to have a headset to log in to the company's timekeeping system, which showed that the employee was present at work as scheduled. Employees could actually log in to work in the timekeeping system at any computer station anywhere on the production floor, including at a supervisor's desk.

Generally, agents logged on to CMS and TKS at the same time. They were not instructed as to which system to log on to first. Agents were required to log in to CMS within three minutes of logging in to TKS. Although it was possible for an agent to log on to TKS and CMS at any supervisor's desk, an agent had to be at his own workstation in order to start work. If an agent failed to start work after logging in, he could be disciplined. Therefore, agents generally logged in to TKS and CMS at their own workstations. No one told Demirelli that he could log on to TKS only so that he could be counted as present.

Because the headsets were detachable, sometimes a headset would not be in an employee's cubicle despite Convergys's policy that headsets could not be removed from the workstations. Hill testified that sometimes Demirelli asked for assistance in finding a headset and it took her less than

a minute to retrieve headsets for agents who needed them. Convergys also denied Demirelli's request

to take a headset home, because of its policy that headsets not be removed from cubicles.

### C. Convergys's attendance policy

During Demirelli's employment, Convergys had in place a no-fault attendance policy. The

policy provides:

> We are working hard to make your employment with Convergys both challenging and
> rewarding. In return, we have high expectations of you as an Associate- *to show up
> for work on-time every day so that you can provide the best possible customer service
> to our clients.*
> . . . .
>
> Tardiness is defined as working less than 100%, but greater than 75% of the
> scheduled shift. An Associate is considered tardy when he or she:
> ✓ Leaves work prior to the end of the scheduled shift (3 minutes or more)
> ✓ Arrives to work after the start of the scheduled shift (3 minutes or more)
> ✓ Returns late from lunch or break (3 minutes or more)
> Multiple tardies can be incurred in a single day, even if the Associate works in excess
> of 75% of the scheduled shift.
>
> Like the absence policy, the tardiness policy is based on a rolling 365-day calendar.
> If you are tardy:
> ✓ Ten (10) times- Will result in documented verbal reminder with specific
>   behavioral expectations.
> ✓ Twelve (12) times- Will result in a documented verbal reminder with specific
>   behavioral expectations.
> ✓ Fourteen (14) times or failure to meet behavioral expectations- You may be
>   terminated.
> ✓ Patterned tardiness will also result in disciplinary action.

(Ex. 27 to Demirelli's Dep.) (emphasis in original). Convergys's attendance policy also provided that

eight absences would result in a written warning and an employee could be terminated upon accrual

of ten absences. In addition, if an employee was absent from work and did not call into Convergys's

attendance telephone line (known as a No Call/No Show) the employee would receive a written

warning. Accruing two No Call/No Show occurrences was considered job abandonment and would

result in termination.

If agents do not report to work at the time they are scheduled, the company may fail to meet contractual performance measures, which in some cases results in the loss of revenue to the company. Specifically, in contracting with its clients, Convergys is bound by Direct Measures of Quality, known as "DMOQs," which define client expectations. DMOQs include the rate at which customers abandon calls due to excessive wait times, and other factors that determine the level of service provided. In order to meet the DMOQs defined by its clients, Convergys tracks the performance of every project in half-hour increments. That information is available to its clients in real-time. Failure to meet contractual DMOQs could result in a revenue loss.

Direct supervisors of the agents, known as Team Leaders, track attendance daily. In addition, Stephen Brookins, Operations Manager of Demirelli's assigned project, conducted audits of agent attendance and reviewed attendance reports daily. If an agent logged into TKS more than three minutes after his scheduled start time, the Team Leader entered "tardy" into the Metrix attendance system. Team Leaders did not always mark incurred tardies on agents' attendance records.

**D. Demirelli's Attendance**

For the first six months of Demirelli's employment, he arrived at work on time and got back and forth between breaks and meal periods timely and without any assistance or accommodations. In July 2001, Demirelli incurred four tardies and one absence. In August 2001, Demirelli received and signed a review from his supervisor at the time, Loretta Hill. In that review Hill wrote, "Yigit understands policies and procedures and attendance." On November 1, 2001, Demirelli received a verbal warning for excessive tardiness. Demirelli had accrued ten tardies between June 2001 and October 2001. For approximately one month after receiving his verbal warning for tardies in November 2001, Demirelli had perfect attendance and no tardies. Demirelli asserted that he accomplished this by "trying to go a little faster."

9

In either December 2001 or January 2002, Demirelli's supervisor at the time, Rick Lartch, went on medical leave and Demirelli was without a direct supervisor until March 2002. Demirelli knew that he was frequently tardy while he was without a supervisor. On March 20, 2002, Demirelli received a written warning from Marlon Mitchell, his new supervisor, for incurring one No-Call/No Show on March 15, 2002. On April 18, 2002, Demirelli received a written warning from Marlon Mitchell for accruing eighteen tardies in a twelve-month period. Demirelli knew at the time he received the written warning that he had already exceeded the number of accrued tardies permitted under Convergys's attendance policy and that he was subject to termination for every tardy over fourteen. On the same date, Demirelli received a written warning for accruing eight absences. The written warning advised Demirelli that "Failure to observe the Attendance Policy of Convergys or any other policy or procedure may result in further disciplinary action up to and including termination."

Mitchell prepared a note to Demirelli's file regarding the tardies. The note stated:

> On April 18th at 6:05 p.m. I discussed with Yigit the reasons for his tardiness. Agent explained that he switched from 3:00 pm to 11pm shift to the 4:30 pm-1:00 am shift, to find available parking. I then asked Yigit to explain why he continued to be tardy after switching shift to his new hours, Yigit explained that he is having difficulty finding a seat on the floor when he arrives at 4:30 p.m. I then suggested to Yigit that he needs to arrive early for his shift to avoid any further tardy occurrences. I then explained to Yigit that it is necessary that he be placed on a written warning for his 19 tardy occurrences and that one more occurrence may result in termination. I then supplied Yigit a copy of the "Associates manual" attendance policy for him to review.

(Ex. 34 to Demirelli's Dep.). Towards the latter part of April 2002, LaShonDa Aldridge became Demirelli's Team Leader. Before Aldridge took over as Demirelli's Team Leader, she met with Mitchell. Mitchell told Aldridge that Demirelli was on a written warning for tardiness and that Demirelli's schedule had been changed to a fixed start time of 4:30 p.m. to allow him to get to work on time.

After April 18, 2002, Demirelli was tardy seventeen times returning to work from his meal break, however, he arrived to work at the start of his shift on time as scheduled.  Demirelli was terminated on June 27, 2002.  On his exit interview form, Demirelli stated:

> I fully realize that I have been less than perfect with my time management here at Convergys.  However, I must point out certain factors that contributed to my tardiness.  First off hand, as I have stated to my superiors before, most of my tardies were caused due to lack of accessible/handicapped parking spaces.  I have even changed my schedule from 3pm-11pm to 4:30pm-1:00 am so that I might find vacant spots as the 4 pm shift leaves.  Correspondingly, after my first manager (Loretta Hill) left Convergys I was left unsupervised, without a manager for a period of two months.  Thus, there was no one to give me a verbal warning so that I would have a chance to stop my tardies.  Thus, because of the reasons I have listed above I feel I have been wrongly terminated.  I would also like to state that I fully contributed all of my talents/skills to the clients of this company in order to resolve their problems.  While I disagree with the decision of the HR dept I want to express I have enjoyed fully working here and interacting with my colleagues.  I kindly request that you reconsider your decision.

(Ex. 40 to Demirelli's Dep.).

Demirelli's Employee Attendance Report produced by the Metrix attendance system from June 27, 2001 to June 27, 2002 shows that he was tardy twenty-one times and had one No Call/No Show during that period.  Demirelli's Counseling Record Form signed on November 1, 2001, shows that he was given a verbal warning for ten tardies.  Demirelli's Counseling Record Form signed on April 18, 2002 shows that he was given a written warning for eighteen tardies.  Demirelli's Counseling Record Form terminating him on June 27, 2002 states that he had twenty tardies.  Demirelli's Counseling Record Form signed on March 20, 2002 shows that he was given a written warning for one No Call/No Show.

The electronic data regarding timekeeping and phone usage kept by Convergys shows that Demirelli was tardy one hundred and two times during his employment.[4] He was late coming to work thirty-seven times and late returning from lunch sixty-five times.

Despite his tardiness, Demirelli received a satisfactory or better rating in the category of attendance in every one of the twelve Performance Reviews that he was given. Demirelli's former supervisors Hill and Aldridge approved raises for Demirelli, rating him a "Quality Contributer."

## IV. Defendant's Motion for Summary Judgment

### A. Standard for ADA Cases

The ADA prohibits discrimination by an employer "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a); Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1205 (8th Cir. 1997). First, the Court must determine the burden of production and persuasion in this ADA case. The burden of proof depends on whether plaintiff alleges a claim of discriminatory disparate treatment or a reasonable accommodation claim. Plaintiff

---

[4]The EEOC disputes this data as contained in defendant's Exhibit 36. The EEOC contends that Exhibit 36 is inadmissible hearsay because (1) Convergys does not have any records reflecting Demirelli's actual scheduled work times, (2) Exhibit 36 was prepared by Teresa Horstmann who did not have Demirelli's work schedules when she prepared the exhibit, (3) Horstmann prepared Exhibit 36 at the request of Convegys's counsel after Demirelli's termination, and (4) despite stating that he had no reason to believe it was inaccurate, Demirelli had not seen Exhibit 36 prior to his deposition so could not know whether it was accurate or inaccurate.

When ruling on a summary judgment motion, the Court may consider only the portion of submitted materials which would be admissible or usable at trial. Walker v. Wayne County, Iowa, 850 F.2d 433, 434 (8th Cir. 1988), cert. denied sub nom Martin v. Walker, 488 U.S. 1008 (1989). Thus, without a showing of admissibility, a party may not rely on hearsay evidence for purposes of a motion for summary judgment. Id., 850 F.2d at 435. In this case, the Court does not have to consider Exhibit 36. In response to the EEOC's hearsay objection, Convergys submitted the affidavit of its Senior Business Systems Analyst Tara Match who avers that Convergys's raw electronic data is consistent with the information contained in Exhibit 36, i.e., Demirelli accrued 102 tardies during his employment there.

asserts that Convergys has "failed and refused to provide reasonable accommodation for Demirelli's disability and terminated him because of his disability, brittle bone disease."  (EEOC Compl. ¶ 8). Because this is a reasonable accommodation claim, the Court will apply a modified burden-shifting analysis.  Fenney v. Dakota, Minnesota & Eastern Railroad Company, 327 F.3d 707, 712 (8th Cir. 2003).

In order to establish a prima facie case of discrimination based on a disability, a plaintiff must show that (1) he is disabled within the meaning of the ADA; (2) he was able to perform the essential functions of his job with or without reasonable accommodation; and (3) he suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination.  Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc).

### 1. Disability within the meaning of the ADA and Adverse Employment Action

The ADA defines the term "disability" as "(A) a physical or mental impairment that substantially limits one of more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2)(A)-(C); Taylor v. Nimock's Oil Co., 214 F.3d 957, 960 (8th Cir. 2000).  "According to the regulations that guide the interpretation of the ADA, an impairment is 'substantially limiting' if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual can perform such an activity compared to the general population.  29 C.F.R. § 1630.2(j)(1)(i)-(ii).  Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, breathing, learning, and working, 29 C.F.R.§1630.2(i), as well as sitting, standing, lifting, and reaching."  Maziarka v. Mills Fleet Farm, Inc., 245 F.3d 675, 679 (8th Cir. 2001) (citing Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 948 (8th Cir. 1999)).

For purposes of summary judgment, the parties do not dispute that Demirelli is disabled within the meaning of the ADA or that Demirelli suffered an adverse employment action, i.e., termination.

## 2. Qualified Individual

To conclude that a person is a qualified individual within the meaning of the ADA, the court must consider whether the person has "the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires." Weber v. Strippit, Inc., 186 F.3d 907, 916 (8th Cir. 1999). "[A] court cannot evaluate a plaintiff's qualifications in a vacuum but must consider the specific essential functions of a particular job." Treanor v. MCI Telecommunications Corp., 200 F.3d 570, 575 (8th Cir. 2000).

"Although an ADA plaintiff retains the ultimate burden of proving that she is a qualified individual, an employer who disputes the plaintiff's claim that she can perform the essential functions of a job must put forth evidence establishing those functions." Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1113 (8th Cir. 1995). An essential function may be established by evidence that includes:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 787 (8th Cir. 1998) (internal quotation marks omitted). A plaintiff need only make a facial showing that a reasonable accommodation that would enable her to perform her essential job functions is possible. Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 950 (8th Cir. 1999). The burden then shifts to the employer to show that it is unable to accommodate the plaintiff. Id. Heaser v. Toro Co., 247 F.3d 826, 831 (8th Cir. 2001).

In this case, Convergys asserts that Demirelli is not a qualified individual because he cannot perform an essential function of his job, being punctual, with or without a reasonable accommodation. The EEOC asserts that punctuality is not an essential function of the job, and even if it was an essential function, Convergys failed to provide Demirelli with a requested accommodation of having a longer lunch period.

Initially, the Court must determine if punctuality was an essential function of Demirelli's job as an agent. Convergys has put forth evidence establishing that punctuality was an essential function. Benson, 62 F.3d at 1113. First, Convergys had an attendance policy, which Demirelli received, that stated it expects its agents "to show up for work on time every day." Second, Convegys had a progressive discipline system regarding absences and tardies. The attendance policy and discipline system show that Convergys considered punctuality as essential. Moritz, 147 F.3d at 787. Third, Convergys schedules its employees based on call forecasting data to ensure that someone is available to answer the projected call volume. Therefore, there could be financial consequences for Convergys if its Associates had numerous absences and tardies. Moritz, 147 F.3d at 787. Fourth, Demirelli was disciplined on several occasions for his tardiness.

The EEOC disputes that punctuality was an essential function of Demirelli's job because Convergys was lax in enforcing its policy and supervisors did not always mark employees tardy. The EEOC contends that Demirelli still received satisfactory or better ratings in the area of attendance and Convergys took into account potential absences or tardies when it scheduled its staff for work. These arguments are not persuasive.

The Eighth Circuit has held that "regular and reliable attendance is an essential function of most jobs." Buckles v. First Data Resources, Inc., 176 F.3d 1098, 1101 (8th Cir. 1999) (citations and quotations omitted). It is of no consequence that Convergys accounted for absences and tardies

when scheduling workers. <u>See</u> Buckles, 176 F.3d at 1101 (court rejects plaintiff's assertion that attendance was an essential function because of the number of employees and the company accounted for absences). It is undisputed that Demirelli had a customer service job, which required answering a certain number of calls in a certain period of time. Further, it is undisputed that Convergys's contract obligated it to appropriately staff operations to answer those calls in a timely manner. If punctuality was not an important job function, Convergys would not need an attendance policy and it would not sign contracts stating that it could handle a certain call volume in a certain period of time. Accordingly, the Court finds that punctuality was an essential function of Demirelli's position at Convergys. <u>See also</u> <u>Earl v. Mervyns</u>, 207 F.3d 1361, 1366 (11th Cir. 2000) (punctuality was essential function of plaintiff's job where plaintiff had to prepare store for opening or take over shift); <u>Nesser v. Trans World Airlines</u>, 160 F.3d 442, 445 (8th Cir. 1998) (attendance is an essential job function).

Next, the Court must determine whether plaintiff "has made a facial showing that a reasonable accommodation would enable him to perform his essential job functions." <u>Dropinski v. Douglas County, Neb.</u>, 298 F.3d 704, 709 (8th Cir. 2002) (quoting <u>Heaser</u>, 247 F.3d at 830). "A reasonable accommodation is one which enables a[n] individual with a disability to perform the essential functions of the position." <u>Hatchett v. Philander Smith College</u>, 251 F.3d 670, 675 (8th Cir. 2001) (citing 29 C.F.R. § 1630.2(o)(1)(i)). Employees seeking a reasonable accommodation must request one from the employer. <u>Id.</u> at 675. Once the employee makes a facial showing that the accommodation is reasonable, "the burden then shifts to the employer to show that it is unable to accommodate the plaintiff." <u>Heaser</u>, 247 F.3d at 831.

In this case, the EEOC asserts that Demirelli requested reasonable accommodations and did not receive them. Further, the EEOC contends that Demirelli would have been able to arrive at work

on time and return from lunch on time if Convergys had granted his requests for accommodation. Convergys, in contrast, asserts that Demirelli could not perform his job with or without reasonable accommodations.

The parties agree that Demirelli requested the following accommodations: a parking space, a personal headset, and to have an assigned seat. In Demirelli's deposition he testified:

> [t]he accommodation I was seeking was a parking space, a headset and a place to sit, which is what I have always told every supervisor. I was not seeking for special treatment or any other type of accommodation. I simply need– required the accommodation of parking, a place to sit and a pair of headphones to be able to do my job on time.

(Demirelli Dep. 94:16-23). Teresa Horstmann, Senior Director of Human Resources, reviewed Demirelli's request for a reserved parking spot and denied it. Horstmann testified as to the reasons for the denial as follows:

> One was it was a public parking lot, meaning we did not have control of that lot. There were several businesses in the area that all shared the parking lot. We had Sanford Brown, there was a government building, there is an SSM Health Center that does a lot of rehabilitative services there, and we did not feel really that that was an option. We knew that, you know, we had disabled employees and we didn't know what the other companies had, but we didn't feel like we could take a specific spot and assign it to others who may need the spot when that spot is not being used.

(Horstmann Dep. 93:23-94:11). Former employee Janet Weaver, however, who was disabled in walking, received a reserved parking spot in the back of the building from Convergys from March 2000 through July 2001. (Weaver Dep. 23:8-25).

Horstmann later testified that, in lieu of the reserved parking spot, Convergys approved a schedule change for Demirelli to work from 4:30 p.m. to 1:00 a.m. Horstmann testified the reason for the schedule change was that, "The parking lot in the evening is much less crowded than it is during the daytime. . . . He was already available evenings." (Horstmann Dep. 97:23-98:2). Both parties agree that no one knows the exact date when Demirelli began working at 4:30 p.m. It is

undisputed that the schedule change occurred before Demirelli's written warning from Mitchell on April 18, 2002, where the time change is noted.

After Demirelli's schedule change, he apparently continued to report late to work as noted in the written warning from Mitchell. Demirelli still had problems finding parking after his schedule change. After receiving the written warning from Mitchell, however, Demirelli was never late for his shift again from that date until his termination. The Court finds that the issue regarding whether a parking space would be a reasonable accommodation is irrelevant regarding Demirelli's termination because he was terminated for tardies received returning from lunch after April 18, 2002. Demirelli was not late for work after receiving his written warning from Mitchell and was not terminated for being late to work, so the issue becomes moot.

Next, Convergys did not grant Demirelli's request to take a headset home. Convergys asserts that employees were not allowed to take headsets home because they might not return them. Again, the request for a headset concerned Demirelli's problems with arriving to work on time and logging in to the computer system. At different times during his employment Demirelli had assigned seating, open seating, and seating in the training area. During the last few months of his employment, including the time after April 18, 2002, Demirelli was allowed to sit in the training area. (Aldridge Dep. 160:2-9). At the time of his dismissal, Demirelli had been sitting in the training area for several months.

The Court finds that allowing plaintiff to sit in the training area was a reasonable accommodation and Demirelli admits that the time change and being allowed to sit in the training area allowed him to log in to the system on time. Also, Demirelli had a headset at his training area, therefore, the lack of a headset was not at issue at the time of Demirelli's termination and was not a factor in the termination.

18

Finally, the parties state there is a dispute about whether plaintiff requested more time for lunch so that he would not be tardy returning from lunch.  Plaintiff's deposition testimony concerning this issue was as follows:

> Q: Did you ever ask anybody for you to be able to have a longer lunch period than anybody else?
>
> A: No ma'am.
>
> Q: You never asked them to change their policy on tardies for you?
>
> A: My words were, "Is there any way that they can work with me on getting back from lunch?" And whenever I said that, I would bring up the suggestion of maybe a pay cut or taking it out of my pay, because that was – I wanted to keep my job.  That was the only thing I could think of.

(Demirelli Dep.  196:7-18).

> In another portion of his deposition, Demirelli testified:
>
> Q: Okay.  And were you requesting that they ignore your tardies or that you get more time every single time you go to lunch?
>
> A: I was requesting that I would do my best to get back from lunch on time, that I would not slack off just because I'm getting more time.  I was simply requesting, if I do have so many tardies, that if they could maybe be forgiven because of my situation.  But I was really not requesting, okay, always give me extra time for lunch, that they change the rule for me.  I was simply saying, if I am late for lunch, this is the reason why, and if you could give me perhaps more of a grace period, more grace time to come back from lunch if I'm tardy.

(Demirelli Dep. 157: 10-24).

There is evidence in the record that Convergys allowed other disabled employees with medical problems to have a longer lunch break or break.  (Brookins Dep.  212:23-214:4; Asthon Dep. 108:22-110:5).

The Court finds that there is genuine dispute of material fact regarding whether Demirelli requested a longer lunch period and whether a longer lunch period was a reasonable accommodation which could have enabled Demirelli to avoid excessive tardies in returning from lunch.  Therefore,

the Court will deny defendant's motion for summary judgment regarding Demirelli's claim that it failed to accommodate his request for a longer lunch period.

## V.  Plaintiff's Motion for Summary Judgment

The EEOC requests summary judgment on Convergys's after-acquired evidence affirmative defense.  First, the EEOC states that Convergys cannot establish that the evidence it contends was after-acquired was first known to it after it terminated Demirelli.  Second, the EEOC contends that Convergys cannot prove with admissible evidence that Demirelli committed the attendance infractions that Convergys claims as after-acquired.  Third, the EEOC asserts that Convergys has unclean hands and should be barred from asserting that Demirelli's remedy should be limited because he did not have legal authorization to work for eight months during his employment.  Finally, the EEOC states that Convergys cannot establish that it would have terminated Demirelli for the offenses it claims as after-acquired evidence.

The Court will deny plaintiff's motion for partial summary judgment without prejudice.  Plaintiff can file motions in limine, if necessary, regarding the evidentiary issues raised in its motion for partial summary judgment.

## VI.  Conclusion

In conclusion, the Court will grant in part and deny in part defendant's motion for summary judgment.  Defendant's motion is denied with respect to plaintiff's ADA claim which asserts that defendant failed to reasonably accommodate his request for a longer lunch period.  Defendant's motion is granted as to the other claims in plaintiff's complaint that defendant failed to reasonably accommodate his request for a parking space, to take a headset home or have a personal headset, and to have an assigned seat.  Plaintiff's motion for partial summary judgment is denied without prejudice.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment is **GRANTED in part and DENIED in part** as set forth in this memorandum and order.  [Doc. 48]

**IT IS FURTHER ORDERED** that plaintiff's motion for partial summary judgment is **DENIED without prejudice**.  [Doc. 51]

An appropriate partial judgment will accompany this memorandum and order.

**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**

Dated this 19th day of January, 2006.